U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUL 1 8 2005

ROBERT H. SHEMWELL, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

RICHARD J. HERNANDEZ                    CIVIL ACTION NO. 04-1306

VS.

COMMISSIONER OF THE SOCIAL              MAGISTRATE JUDGE METHVIN
SECURITY ADMINISTRATION                 BY CONSENT OF THE PARTIES

## MEMORANDUM RULING

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, the court

concludes that there is no substantial evidence to support the ALJ's finding that Hernandez is not

disabled. Accordingly, the Commissioner's decision is **REVERSED**.

### Background

Born on October 16, 1952, Richard Hernandez ("Hernandez") is currently 52 years old.

He has a general equivalency diploma and has worked in the past as a janitor, material handler,

yard worker, truck driver, and construction worker. On May 5, 2000, Hernandez applied for

disability insurance benefits and supplemental security income alleging disability beginning

September 30, 1999 due to emphysema, depression, and back problems. On September 19 2001,

a hearing was held before an ALJ, who issued an unfavorable decision on November 9, 2001.[1]

Hernandez filed a Request for Review with the Appeals Council, which remanded the case back

to the ALJ, directing the ALJ to evaluate the examining source's opinion and to obtain the

testimony of a vocational expert.[2] On July 15, 2002, a second hearing was held, before a

---

[1]Tr. 280-288, 373-396.

[2]Tr. 295-297.

different ALJ, who issued a decision finding that Hernandez was not disabled.[3] The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner from which Hernandez now appeals.

### *Assignment of Errors*

Hernandez alleges that the ALJ erred in: 1) improperly weighing the medical opinions and substituting her lay opinion for the uncontradicted medical evidence; 2) relying upon the testimony of the vocational expert which did not incorporate all of the limitations caused by Hernandez's mental impairments; 3) failing to request additional information from the treating psychiatrists and the consultating psychologists regarding the GAF scores; and 4) rejecting the opinion of a medical source and refusing to consider the pulmonary limitations in combination with his mental limitations.

### *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of

---

[3]Tr. 25-34.

the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson

v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate

only if no credible evidentiary choices or medical findings exist to support the decision.

Johnson, 864 F.2d at 343.

### Procedure for Analysis of Impairments and the ALJ's Findings

In determining whether a claimant is capable of performing substantial gainful activity,

the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f)

(1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

When a mental disability claim is made, such as the depression alleged here, the

Commissioner utilizes a corollary sequential procedure for determining the merits of the claim.

Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a

mental impairment is severe, and also provides detailed guidelines for making the Step 3

determination as to whether the mental impairment meets or exceeds the Listings. The procedure

can be summarized as follows:

1. The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he or she has a medically determinable mental impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004),[4] citing 20 C.F.R. §404.1520a(b)(1).

2. If a medically determinable mental impairment is found, the ALJ must then rate the degree of functional limitation resulting from the impairment. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(b)(2). To perform this latter step, the ALJ should assess the claimant's degree of functional limitation in four areas: (1) activities of daily living; (2) social functioning; (3) persistence or pace of concentration; and (4) episodes of decompensation. See C.F.R. §404.1520a(c)(3). If the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1).

3. When a severe mental impairment is found, the Commissioner determines whether the impairment meets or exceeds the requirements of the Listings. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(2) (2002).

4. When the severe mental impairment does not meet Listing requirements, the Commissioner then assesses the claimant's residual functional capacity. Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(3) (2002).

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.* Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1). In the Fifth

---

[4] The undersigned was unable to find any Fifth Circuit cases setting forth the proper procedure for analyzing mental disability claims since the revisions and amendments to 20 C.F.R. §404.1520a in 2000. The revisions and amendments became effective on September 20, 2000. 65 Fed. Reg. 50,746 (August 21, 2000). See Boyd v. Apfel, 239 F.3d 698, 705 n.11 (5th Cir. 2001). The Serrano-Diaz decision is therefore cited as the most succinct summary of the current law that the undersigned was able to find during research for this report and recommendation.

Circuit, courts adhere to the standard set forth in Stone v. Heckler, 752 F.2d 1099 (5ᵗʰ Cir.1985)

in assessing the severity of an impairment. In Stone, the Fifth Circuit declared that severity of an

impairment must always be determined with regard to an individual's *ability to perform*

*substantial gainful employment*, and cannot be based on medical severity alone. Moreover, the

Fifth Circuit articulated the correct severity standard as follows:

> [A]n impairment can be considered as not severe only if it is a slight abnormality
> [having] such minimal effect on the individual that it would not be expected to
> interfere with the individual's ability to work, irrespective of age, education or
> work experience.

Stone, 752 F.2d at 1101. The court further stated that "[W]e will in the future assume that the

ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless

the correct standard is set forth by reference to this opinion or another of the same effect, or by an

express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used." Id.

at 1106.

In the instant case, the ALJ determined that Hernandez suffered from the following severe

impairments: pulmonary disease, back pain, depression, a personality disorder and alcohol

dependence.[5] Despite these impairments, the ALJ found that Hernandez could perform medium

level work with: 1) limitations on his ability to climb; 2) only simple one and two-step tasks; and

3) work that involves only limited interaction with the public and co-workers.[6] Relying upon the

testimony of the vocational expert, the ALJ found that Hernandez could perform a significant

number of jobs which exist in the local and national economies, and therefore he was not

---

[5] Tr. 27.

[6] Tr. 30.

disabled. After a review of the entire record and the briefs of the parties, and pursuant to 42

U.S.C. § 405(g), the court concludes that the ALJ's findings and conclusions are not supported

by substantial evidence in the record.

### *Medical History*

**Physical impairments:** In 1992, Hernandez was diagnosed with chronic obstructive

pulmonary disease ("COPD") and emphysema.[7] On January 28, 1999, Hernandez was examined

at University Medical Center ("UMC") complaining of shortness of breath.[8] An x-ray of the

chest showed that the lungs were hyperinflated and there was flattening of the diaphragm, which

are compatible with a finding of COPD.[9] On March 31, 1999, Hernandez underwent a

pulmonary function test, which indicated "mild obstructive ventilatory defect with reversible

component."[10] In June, 1999, Hernandez was examined at UMC, complaining of fatigue.[11] It

was noted that Hernandez had mild obstructive ventilatory defect, chronic bronchitis, alcoholism,

and fatigue. Hernandez was prescribed Combivent for the obstructive defect. Hernandez was

told repeatedly by physicians to stop smoking in order to relieve the COPD.[12]

On November 9, 2000, at the request of Disability Determination Services ("DDS"),

Hernandez was examined by Dr. Kenneth Ritter, an internist.[13] Dr. Ritter's notes state,

---

[7] Tr. 182.

[8] Tr. 203-204.

[9] Tr. 203.

[10] Tr. 210.

[11] Tr. 202.

[12] Tr. 182, 226, 230, 329.

[13] Tr. 141-143.

"Pulmonary function study performed in my office at your request revealed mild obstructive ventilatory defect with significant improvement after bronchodilator."[14] Dr. Ritter completed a Medical Assessment of Ability to Do Work-Related Activities-Physical indicating that Hernandez could occasionally lift 25-35 pounds, frequently lift 10-25 pounds, and he had no environmental limitations.[15] On December 12, 2000, a Physical Residual Functional Capacity Assessment was conducted by the Social Security Administration ("SSA").[16] The examiner found that Hernandez could occasionally lift 50 pounds, frequently lift 25 pounds, only occasional climbing, and he should avoid concentrated exposure to fumes.[17]

On February 10, 2001, Hernandez was examined at UMC for complaints of left shoulder and neck pain.[18] An x-ray of the shoulder was normal.[19] On December 5, 2001, Hernandez was prescribed Vioxx for low back pain.[20] On May 1, 2002, Hernandez was examined at UMC, complaining of chronic low back pain.[21] It was also noted that Hernandez is mildly obese, has low blood pressure, hyperlipidema, Hepatitis B, depression, and prostatitis. He was prescribed Zocor for hyperlipidema, Celebrex for back pain, and Effexor for depression.[22]

---

[14] Tr. 143.

[15] Tr. 147-148.

[16] Tr. 127-134.

[17] Tr. 130-131.

[18] Tr. 238.

[19] Tr. 236.

[20] Tr. 331.

[21] Tr. 329.

[22] Tr. 328.

**Mental impairment:** During Hernandez's examinations at UMC for his physical impairments, his depression was noted.[23] On January 13, 2000, Hernandez was examined at Joseph Tyler, Jr. Mental Health Center. During the interview, Hernandez reported that he has suicidal thoughts, two days before the examination he took 24 Tylenol P.M.s within 24 hours, he binge drinks, he has a violent temper and he tried to burn his girlfriend's face.[24] Hernandez reported that his father died while driving drunk when Hernandez was four-years-old and he was molested at that age of 11.[25] Hernandez was diagnosed with Major Depressive Disorder, Dysthymia,[26] and alcohol abuse, and was given a Global Assessment of Functioning ("GAF") score of 50.[27] Tyler Mental Health notes from February 6, 2001, indicate that Hernandez has suicidal thoughts daily, he is unable to focus, he isolates himself from others for four-to-five days, and he sleeps only two or three hours a night.[28] Hernandez was prescribed Effexor for depression and  underwent monthly examinations at Tyler Mental Health until August, 2001, when his mood seemed improved and he was told to return in three months.[29] On November 15, 2001, Hernandez reported increased isolation and depression and began monthly group therapy

---

[23] Tr. 177, 194,  202, 329.

[24] Tr. 256.

[25] Tr. 256.

[26] Dysthymia is a chronic form of depression.
    http://www.surgeongeneral.gov/library/mentalhealth/chapter4/sec3.html

[27] Tr. 253.

[28] Tr. 251.

[29] Tr. 240-244.

sessions.[30] In May, 2002, Hernandez's mood was stable and he was sleeping better, but his GAF remained 50 and his diagnoses was Major Depressive Disorder, Recurrent, and Dysthymia.[31]

On January 9, 2001, at the request of DDS, Hernandez was examined by Alfred Buxton, Ph.D, a clinical psychologist.[32] Dr. Buxton noted that Hernandez's intellect was normal and he is competent as a manger of his own affairs. Dr. Buxton diagnosed Hernandez with "Major Depressive Disorder, Recurrent, Without Psychotic Features, with degree of impairment moderately severe and prognosis guarded as well as Alcohol Dependence." Dr. Buxton concluded:

> If he were fortunate enough to secure gainful competitive employment it is highly
> unlikely he would maintain that employment for a protracted period of time
> secondary to the negative impact of the aforementioned factors on his general
> functional status. He would not deal well with the frustration and stress that he
> would encounter in the job setting and one would see exacerbation in the
> depressive disorder and he probably will respond in a fashion that would work to
> his own demise. He may be able to establish but might have some difficulty
> maintaining mutually rewarding relationships with co-workers and supervisors
> alike.[33]

In January, 2001, a Psychiatric Review Technique ("PRT") was conducted by the Social Security Administration ("SSA").[34] The examiner found that Hernandez has mild restrictions of his activities of daily living and maintaining social functioning.[35] He further concluded that there was insufficient evidence regarding whether Hernandez has restrictions in maintaining

---

[30] Tr. 347-349.

[31] Tr. 336, 347.

[32] Tr. 135-138.

[33] Tr. 137.

[34] Tr. 109-122.

[35] Tr. 496.

concentration persistence, or pace. Hernandez has not had repeated episodes of decompensation.[36] A mental residual functional capacity assessment was also conducted by SSA and the examiner concluded that Hernandez's mental abilities were not significantly limited, with the exception that Hernandez has moderate limitations in the areas of ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to work in coordination with or proximity to others without being distracted by them, ability to complete a normal workday and workweek, and ability to interact appropriately with the general public.[37]

On September 11, 2002, Dr. Naomi Friedberg, Ph.D., a clinical psychologist, examined Hernandez at the request of DDS when the case was remanded to the ALJ for further proceedings by the Appeals Council.[38] Dr. Friedberg diagnosed Hernandez with "Major Depressive Disorder, Recurrent, Moderate to Severe with significant suicidal risk; Personality Disorder, NOS, with strong Schizoid Features, and Alcohol Abuse in Remission."[39] Dr. Friedberg noted that Hernandez's level of depression is erratic even with mental health care. Hernandez has frequent

---

[36] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." 20 CFR Pt. 404, Subpt. P, App. 1

[37] Tr. 502.

[38] Tr. 357-361.

[39] Tr. 359.

suicidal thoughts, and he does not like being around others. He reported having a long history of

losing jobs or quitting because of poor work relationships. Dr. Friedberg concluded:

> It is likely Mr. Hernandez would not handle the interactive/social pressures a
> structured employment setting would involve, and it is likely his level of
> depression would negatively impact his ability to complete a normal work day or
> work week, performing at a consistent pace and maintaining punctual attendance
> within a schedule. He appears to be able to perform the simplest level of adaptive
> living abilities, such as acquiring adequate amounts of food, occasional minimal
> self-care, and ability to handle money. He is marginally capable of handling his
> own benefits, although finding someone to aid him in this may be of benefit, as
> Mr. Hernandez seems to lack quite a bit of judgement when his level of
> depression increases.[40]

### Findings and Conclusions

Hernandez maintains that the ALJ erred in substituting her lay opinion for that of the

physicians, which lead to an inadequate hypothetical to the vocational expert, improper

assessment of psychological scores, and a failure to acknowledge Hernandez's non-exertional

limitation concerning exposure to fumes. The Commissioner argues that substantial evidence of

record supports the ALJ's decision because the medical evidence was inconsistent.

Although the ALJ is entitled to determine the credibility of the examining physicians and

medical experts and to weigh their opinions accordingly, this discretion is not without bounds.

Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994). "The ALJ is free to reject the opinion of

any physician when the evidence supports a contrary conclusion" and he is able to decrease

reliance on treating physician testimony for good cause. Leggett v. Chater, 67 F.3d 558, 566 (5th

Cir. 1995); Martinez v. Chater, 64 F.3d 172, 175-176 (5th Cir. 1995), quoting, Bradley v. Bowen,

809 F.2d 1054, 1057 (5th Cir. 1987). "Good cause for abandoning the treating physician rule

---

[40] Tr. 359.

includes 'disregarding statements [by the treating physician] that are brief and conclusory, not

supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise

unsupported by evidence.'" Id.

In concluding that Hernandez was not disabled, the ALJ essentially discounted either the

opinion or portions of the reports of every examining psychologist or psychiatrist:

> The claimant's representative has made much of the fact that Dr. Cloyd and
> Dr. Hu, also a psychiatrist, at the Joseph Henry Tyler, Jr. Mental Health Center,
> have reported the claimant's Global Assessment of Functioning score to be 50.
> The Diagnostic and Statistical Manual of Mental Disorders (4th Ed.) Instructs that
> such a score is indicative of serious symptoms (such as suicidal ideation, severe
> obsessional rituals, frequent shoplifting) or any serious impairment in social
> occupation or school functioning (such as no friends, unable to keep a job). A
> GAF score is accepted as a summary and an approximation of the claimant's
> functioning, but, as the DSM-IV definition suggests, it can mean any number of
> things, including simply having no friends. By his own admission, Mr.
> Hernandez chooses not to have friends, and the undersigned is unwilling to guess
> which, if any, of the alternative elements of a GAF of 50 may apply to this
> claimant. In light of the more specific information provided in the treatment
> records, the claimant's GAF score is not accepted as evidence of a completely
> disabling mental impairment. Indeed, on the most recent form prepared by the
> claimant's physician on May 9, 2002, the doctor reported a GAF of 50 but also
> noted that the following categories were not applicable to the claimant's need for
> treatment: disturbed thinking, problems meeting basic needs, behavior problems,
> dysfunctional role performance and problems in interpersonal relationships.
> Surely if the claimant were entirely unable to function in a work-like setting due
> to difficulty getting along with others, as alleged, some of these problems would
> be applicable to the claimant's treatment. Applicable categories were substance
> abuse or dependence, emotional health problems and physical health problems.

> In determining the claimant's residual functional capacity, the Administrative Law
> Judge has considered the consultative examination reports of Drs. Buxton and
> Friedberg. In January 2001, Dr. Buxton opined that the claimant would be
> unlikely to maintain employment for a protracted period of time due to mental
> health issues, particularly difficulties dealing with stress and maintaining
> relationships with co-workers and supervisors alike. A closer review of the
> evidence, however, suggests that any failure to maintain employment would be
> volitional on the party of the claimant. Specifically, Mr. Hernandez has testified
> to mental health problems with suicidal ideation since he was sixteen years old.
> He has, however, maintained employment for as many as six years on a single job

since the onset of his mental problems. Currently, treatment records reveal the absence of suicidal ideation and fairly successful treatment on medication. The caution of two consultative examiners as to the claimant's ability to work pales in comparison to the claimant's actual work record even prior to treatment of his depressive disorder. With treatment, there is no reason that Mr. Hernandez would be unable to maintain a job within his functional capacity.[41]

Thus, the ALJ discredited Drs. Cloyd and Hu's opinions regarding a GAF score of 50, which indicated that Hernandez's symptoms were severe and may interfere with employment, because the ALJ was unclear as to the basis for the score. The ALJ did not seek additional information from the sources concerning the GAF score, but simply chose to ignore it. Further, the ALJ discounted the opinions of Drs. Buxton and Friedberg regarding Hernandez inability to maintain employment due to his psychological problems. The ALJ's analysis, however, ignores the fact that the treating physicians' GAF scores of 50 and the consultative examiners opinions were consistent, and when reviewed together, provide overwhelming support for the fact that Hernandez's depressive disorder prevented him from performing work on a daily basis in a work-like setting.

Two psychologists have examined Hernandez and determined that he is incapable of coping with the pressure of a structured employment setting and he could not complete a normal workday or workweek. No examining source has disputed these conclusions. Instead, the ALJ substituted her lay opinion and determined that since Hernandez claims that he's been depressed since the age of 16 and since then he has been employed, then he is employable now despite his depression. This conclusion lacks any support, much less substantial support, in the record. Whether or not Hernandez was able to function at a time prior to his alleged onset date is

---

[41] Tr. 29-30.

immaterial to whether or not he is disabled at this time. Moreover, there is no information regarding the degree of Hernandez's depression prior to his onset date and whether it has increased in severity. Additionally, the ALJ's implication that since treatment notes dated May, 2002, state that Hernandez's mood was stable and he was sleeping better, his mental impairments had improved, amounts to the ALJ picking and choosing only the evidence which supports her conclusion.[42] The ALJ ignores the fact that Dr. Friedberg reported that Hernandez's depression was erratic even with treatment, and therefore, the fact that on one day his mood was stable does not indicate significant improvement. Further, despite the note in May, 2002 that Hernandez's mood was stable, the diagnosis remained severe major depression, recurrent. The record is void of any medical evidence indicating that Hernandez's mental impairments had improved. Thus, the ALJ erred in disregarding the medical evidence in favor of her own lay opinion regarding Hernandez's ability to work while suffering depression.

The record establishes that Hernandez suffers from chronic depression as well as other medical impairments. This is not a case where there are conflicting reports regarding the severity of the claimants' symptoms or the impact those symptoms have on the claimant's ability to work. Rather, this is a case where the evidence establishes that Hernandez has been diagnosed with recurrent moderate to severe major depressive disorder, he has suicidal ideation, and he is socially withdrawn. Two examining psychologists have opined that Hernandez has impairments which prevent him from handling the day-to-day stress of employment and there is no

---

[42] Tr. 30, 336. An ALJ may not "pick and choose" only that evidence which supports his decision, but must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence. Armstrong v. Sullivan, 814 F.Supp. 1364, 1373 (W.D. TX 1993), citing, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir.1983); Rivera v. Sullivan 771 F.Supp. 1339, 1351, 1354, 1356 (S.D.NY 1991).

contradictory evidence submitted by examining sources. Thus, substantial evidence does not support the ALJ's determination that Hernandez could perform work on a daily basis.

In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831. We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id.* (*citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5ᵗʰ Cir. 2002).

The undisputed medical evidence of record establishes that Hernandez cannot perform work on a sustained basis. Thus, the ALJ erred in not finding that Hernandez was disabled beginning September 30, 1999.

### Conclusion

Considering the foregoing, the Commissioner's decision is **REVERSED.**[43]

Signed at Lafayette, Louisiana on July _15_____, 2005.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

---

[43] This constitutes a "final judgment" that triggers the filing period for an EAJA fee application. Shalala v. Schaeffer, 509 U.S. 292, 113 S.Ct. 2625, 2631 (1993); Freeman v. Shalala, 2 F.3d 552 (5ᵗʰ Cir. 1993).